Okay, great. And Mr. Sirianni there on my right, I see. We'll hear argument in the United States against Hamlet, Phillips, and Manley. Mr. Epstein. Recording in progress. Thank you, Your Honor. May it please the Court, my name is Robert Epstein. I'm here today on behalf of the three appellants, Mr. Phillips, Mr. Manley, and Mr. Hamlet. With the Court's permission, I'd like to reserve three minutes of my time for rebuttal. Thank you, Your Honor. I'd like to begin with the Batson issue, and if time permits, the two sell-site-related issues. As to the Batson issue, the prosecutor removed five, with his preemptory challenges, five out of the six of them removed African-American jurors. We are focused here today on juror number 50. The prosecutor gave two reasons for her removal. Her membership in the NAACP and her quote-unquote strong personality. Both of these reasons are deeply troubling. I'll begin with the NAACP reason. The NAACP is this country's leading, most preeminent civil rights organization dedicated to stamping out discrimination against African-Americans in all walks of life. And because of that, both federal and state court judges, and I'm referring now specifically to the Fifth Circuit's decision in Guidry, the state and federal court judges in that case recognized that there would be something inherently discriminatory about removing a juror because of his or her membership in the NAACP. And because of that, both the state and federal court judges in that case refused to even consider that as a proper reason for removing the juror, and they only considered the prosecutor's other five reasons for striking that juror. Likewise, the Texas Court of Appeals in Somerville said that membership in the NAACP is not a race-neutral reason. It does not pass muster at bats in step two. And they said we would appear to condone racial discrimination if we accepted that as a valid basis. How, if at all, does that argument that you just made change when the prosecutor explains it's not the mere membership in that organization. It's the fact that the organization has taken a public position on a relevant issue in this case. Does that change anything? Well, the problem with that explanation, Your Honor, is that the government raised that, and because of that, the district court questioned the juror about her membership. And she answered that she had no knowledge of the NAACP's criminal justice reform efforts. Her membership was limited to community service. So this is a case like this court's decision in Jones v. Ryan, where this court found that the prosecutor's policy rationale and concern had no applicability to the juror. And as such, it failed to meet bats in step two requirement that it be a neutral explanation related to the case to be tried. And it failed at step two, as it does here. When the prosecutor raises this sort of counter-argument, and the juror says, but I don't know anything about the public position, I just am a member for other reasons, is the prosecutor or is the trial judge obliged to believe her when she says that? Yes, Your Honor. So as the government cites Foster for the proposition that the prosecutor doesn't have to take the juror's answers at face value, Foster doesn't help the government, though, at all. Because Foster's really right on point. What happened there was that the prosecutor struck the juror saying, I don't like the fact that he's a member of a particular church. So the judge questioned the juror about whether or not he can impose the death penalty. And that was the prosecutor's complaint about membership in this church, that the church had a position against capital punishment. And the juror said, I can impose the death penalty. So the prosecutor in that case said, well, I don't believe the juror. But the Supreme Court found the prosecutor didn't present any good grounds for not believing the juror. And, in fact, the Supreme Court found that it was the prosecutor who was being less than honest about his true intent. So here, this is very interesting what happened here, because the court questions the juror about her membership in the NAACP. She gives her answers. Then, later, when the prosecutor strikes her and the defense objects, and the prosecutor states his concern about the NAACP, the judge is dismissive of the prosecutor's concerns, saying, I questioned her three times about this. Her membership is just about community service. And at that point, the prosecutor says, well, I don't have to take her answers at face value, but then doesn't give any reasons to disbelieve the juror, and with good reason. I mean, we can't imagine a more model citizen to have on a jury. This is a juror with a master's degree in higher education, steady employment, active in her church, volunteers at a food pantry, does community service with the NAACP, coaches girls' basketball on the side, and she even says her favorite show is Law and Order. So this should have been a perfect juror for the prosecution, yet they removed her anyhow. They don't give any reasons to disbelieve her. And what they do instead is shift to their second reason, which in some ways is even worse, the concern about her having a quote, unquote, strong personality. And when they try to explain that, they say, she sort of interrupted your honor, but she never did. And they don't dispute that on appeal. And then it gets worse when the court comes back two days later and says, I didn't really make findings about the juror. We have to talk about it. The prosecutor now gives a new reason concerning her strong personality, that she coached some type of sporting event. Your Honor, this is precisely the kind of fantastic, implausible explanation that the Supreme Court sent in Percat is going to lead to a finding of pretext. And what's particularly concerning here is the prosecutor is stating that as a reason, but never asked the juror or asked the court to ask the juror anything about her, anything about her coaching. So we don't even know what level of coaching this juror did. Judge Roth, are you still there? I think we lost her. Did you notice how long ago? Hi, Judge, it's Greg over Zoom. I'll get her back on shortly. Okay. Okay. And just stop the clock for a minute. Shall we? Yeah, I'll just wait. Thank you. I'm sorry, we have a full panel. Okay. Okay. Okay. Thanks for your patience, everyone. Judge Roth is going to connect through audio only, and that will happen momentarily. Okay. I'll let you know when she's connected. All right. Okay. Okay.  Okay. Okay. Judge Roth, can you hear me? Yeah, I can hear you. Okay, Judge Roth is connected. Okay, great. Okay. We'll go back on the clock. Okay. I got disconnected just when we were talking, maybe getting to talk about personality. Strong personality, yes. Thank you, Your Honor. Before we resume, Judge Roth, did you have any questions you wanted to jump in? It's going to be harder since we can't see you, so I'll give you an invitation right now. I don't think so. Just go on ahead. I can answer my questions. All right. Okay. Where we left off, I was saying the prosecutor asked no questions and asked the judge to ask no question about what level of girls' basketball this juror coached. And the Supreme Court in Miller L. v. Dredge addressed this where there's a supposed concern, but the prosecutor asked no questions about it. And they quote a Supreme Court of Alabama case there where the court said, the State's failure to engage in any meaningful voir dire on a subject the State alleges it is concerned about suggests that the explanation is a sham and a pretext for discrimination. Maybe I might have missed it. You can correct me if you need to. But I thought the strong personality comment was based on the juror's direct and immediate and firm answers to questions, sort of her demeanor answering questions, not so much the coaching basketball. Well, that's the answer the allegation or the assertion the prosecutor made when the judge revisited. As far as on the first day when this came up, when the prosecutor said she seemed confident, the judge was very dismissive of that. The judge said, yeah, half of the jurors hesitate, half of them don't hesitate. And when it came back two days later, the prosecutor now referred only to her coaching some type of girls' basketball or some type of sporting event, he said. Let me ask about the statistical, the five out of six. Yes. When I looked at Miller L. Foster Flowers in our own most recent case, Savage, the kind of fraction was number of minorities struck in the periphery strikes, which is in the numerator. The denominator is the number of minorities that were in the veneer. Right. So it was like five out of ten, not five out of six. Do you see the difference? Yeah. You know, I think that makes sense. When you have a small amount of African-Americans in the jury pool. Right. And then the prosecutor is striking a high percentage of those. But whereas in a case like this you have, it'll be about 50-50 in the jury pool, it wouldn't make any sense to look at it that way because, you know, the prosecutor here could have struck all of his six challenges, could have been African-Americans. It would still be a large denominator compared to the numerator. What's relevant here is that five out of the six challenges were against African-Americans, 83%, and we had a 50-50 jury pool, and we only ended up with four African-Americans on the jury. Can you give us any authorities where the court did the math the way you're suggesting? Not often. Yeah. Okay. Thank you. All right. Mr. Sirianni. Thank you. I'm hearing a rebuttal. May it please the Court. Thank you, Mr. Epstein, for sharing your time today. My purpose today is to address specifically the Jinx Act issue, and I'd like to narrow my argument to the discovery of that argument on appeal. In the lower court, a Jinx Act motion was filed before trial. Let me ask you a question. In the first trial, defendants filed a letter asking for the preservation of, and it included the preservation of, rough notes. At the second trial, I didn't see a similar request. I saw a request related to documents for new witnesses. Is there a difference, and does it matter? That's a good question, and I believe you're right on the nuance of the language. Our opinion is that, no, it does not matter because the language of 18 U.S.C. 3500 is quite broad and would include notes or transcriptions or agent materials or statements made by any witness, including a material witness such as a co-defendant, and that would also include any notes or summaries made by agents as well. So the language that is articulated by the appellee is quite narrow, would lead the court to believe that Jinx material only applies to direct examination testimony, but when we requested anything that was, like you said, outside of not just discoverable material but notes and so forth, that would be very, very broad. We can get agent notes. We can get notes of witnesses and so forth. Well, I guess my question is, if you didn't ask for it in the second trial, how are we to read that? Is that a forfeiture? Is it a waiver? What standard of review applies? How are we to read that? Well, that's a good question. The court did address the Jinx Act during trial. We did not get materials until, like, a day before trial on certain aspects of the witnesses, and although the defense attorney did say that some of that was satisfied, I don't believe it's a waiver because the way I read 18 U.S.C. 3500, it's quite broad. When we talk about materials that we're requesting, that would include everything. We need notes. We need notes of agents, but we also need notes of any materials that relate to witnesses. So as I read Gross and Ramos, I mean, our cases have been a little bit back and forth on this, but at least these two, Gross and Ramos, seem to say that rough notes and agents' notes of an interview, if they're not a transcription or sort of a near transcription, they're not Jinx material. How do you square that with your argument? Yes. Yeah, so the way I read that as well is that it would have to be something that would be a sworn testimony or something that was a statement that was under a transcription or near verbatim. Yeah. So if it's near verbatim, I believe we should be entitled to it. And that would include all the notes, not just mere summaries of the notes. So I guess my point is that the FLE makes a very, very narrow reading of the statute. We read the plain language of the statute to suggest that we should get the actual notes, not just summaries of the notes, if they're verbatim. And a writing is a verbatim statement from a witness such as an agent or a material witness or a codefendant. So we have no clue if they're verbatim or not. Nothing's in front of us. We need to remand this to the district court for it to make a determination? That's right. We have no idea. And I can't represent to the court what they are. I can't in good faith say if the statements are – all I know is that we got summaries. I do know that there were verbatim written notes taken by agents and also witnesses that we did not get. I think based on that, I would like a remand for discovery of those materials. And with that, I'd like to rest if there's any further questions. I have another question. I have another question. So your friends on the other side, at least in the briefing, say, well, the notes are substantially identical to the summaries that you received, and they point to a case that was about reports. And my question is, does that substantially identical language also apply to notes, if not one-up? Yes. Well, in reply to that, we cited the United States v. Auten case. And in that case, a mere criminal record was enough to grant a new trial. And in this case, a summary or substantial summary would not rise to the level to satisfy the defense so that we could make an adequate defense to cross-examine or impeach witnesses. So if the court's going to remand under a United States v. Auten for a mere criminal record, why not remand so that we can get all the full notes and full discovery that we should be entitled to so that we can impeach agents and impeach witnesses and impeach co-defendant testimony to determine whether or not Mr. Hamlet's a shooter or how far he's involved in the conspiracy, if not. As I recall, the substantially identical issue, I think it was Amar, the issue was that whatever was in the notes was substantially identical to whatever was in the final report. And we said that's sufficient. Or if it wasn't turned over, it was harmless error, I think, because of the substantial identity. I guess we don't know if there's a, I think the government has said that the, whatever these notes are we're fighting about here are substantially, were essentially incorporated into whatever the final report was. Yes. We're supposed to take the prosecutor's word and not give discovery and due process to the defendant so he can determine if they're substantially identical or not. Did you ask the, did the defendants ask the district court to do an in-camera review? No, there was no in-camera request, but I believe the court should have granted one. The court should have just made an in-camera review so that the defense could determine, we can go to the prosecutor's office, we can go to AUSA's office, and we can look at discovery materials and we can make our own assumption of whether or not the documents are substantially the same. I mean, but if you take a step back and put yourself in looking at the facts, and I want you to correct me if I'm wrong about the facts, but as far as I can tell, there is a letter that says you have the first trial that absolutely there's a clear request for everything, including notes. When you get to the second trial, there is a request for Jenks material, and then after the request for Jenks material, there is a statement about the potential for new witnesses. When you get to the hearing, the government represents that there will not be new witnesses. And then the court says, I believe there's a request for Jenks material, and then the counsel's response is, well, they just informed us that there are no new, I think no new witnesses or maybe no Jenks materials. I'm trying to remember. I can't remember exactly how it's worded. But is that broad enough to capture that the court should have been on notice, that it should have given notes? Yes, I believe so. And I understand your question very well. It's a good question. And my response is that when you ask for Jenks material, you're operating under the statute of 18 U.S.C. 3500. And the way I read the statute to this court is that it is the opportunity of the court to make sure that all aspects of discovery are complied with and all notes, agent's notes, are reviewed. And in my opinion, the court should have given a sua sponte order saying, hey, if you want to go look at this stuff, you can go to the AUSA's office and you can determine whether or not it's substantially the same or not. Even after counsel apparently agree when government says there is nothing and then defense counsel says, well, it sounds like there is nothing. Right. But I don't think that obviates the rights of the defendant, the client. Okay. Just because the attorney says that, I don't think that means the client is not able to make sure there's some review. And like I said, even at the United States Attorney's Office of those materials to determine if they're substantially similar. And that to me does not operate as a waiver to the client's rights to see if the materials are the same or not and whether or not he could use those materials to impeach witnesses. Okay. Judge Rock, did you have anything for Mr. Sirianni? No, I don't. All right. Thank you. Okay. Thank you. Mr. Coyne. Thank you, Your Honors. And good afternoon. Mark Coyne for the United States. Unless the court has questions regarding the Jenks Act issues, I'm happy to turn to the Batson issue. Sure. As this court's own precedent and Supreme Court precedent itself makes crystal clear, substantial deference is owed to the trial judge's assessment of the credibility of the prosecutor's stated non-racial, not race-neutral reasons for a peremptory challenge, and then the trial judge's assessment of all the evidence in determining whether to credit those reasons as the prosecutor's real reasons and finding, if the trial court so finds, that those reasons are not pretext for discrimination. Judge Arlio did what controlling precedent, what the Supreme Court's precedent requires and what this court's precedent required in requiring the government to advance its race-neutral reasons for all of its strikes. And I understand now from my friend, Mr. Epstein, that we're focusing exclusively now on Juror 50. We're not focusing on Juror 11 or any of the other peremptory strikes. The prosecutor provided his race-neutral reasons. The judge did not make an express finding on Day 3. Although she overruled the Batson challenge, the judge was concerned she had not made the kind of express findings that this court's precedent and Supreme Court precedent requires. And instead, so revisited the strike of Juror 50 on Day 5. And she did that, mind you, just to give the full context of this. She did that after breaking early on Day 4 at 4.30. She then, in my brief, I'm sorry, I was mistaken about this. I thought the proceedings resumed the following morning. They actually resumed the following afternoon at 1.45. And by then, by the time Judge Arleo took the bench to return to the Batson issue, specifically regarding Juror 50, although she also addressed Juror 11, she had received briefing from the government, from defense counsel below, and a reply from the government. She had said she had spent the entire night and much of the morning reviewing that briefing, the case law, and the transcripts, the relevant portions of Wadir and the relevant portions of the Batson challenges that had occurred to that point. She expressly invoked multiple times and quoted multiple passages of Judge McKee's presidential opinion for this court in Coombs, including the passages cautioning about implicit bias and the difficulties triers of fact might have in finding that somebody they may know personally and respect had engaged in an invidious motive in striking somebody. She acknowledged all that. She said that. She said, that's my job. And don't worry about that. I'm prepared to do my job. And then she went on to say, the ultimate question for me at Step 3 is, are they just making this up? And she said that multiple times. And so, and then after she returned, she also acknowledged that during Day 3, she had interrupted my colleague when he was offering the government's two race-neutral reasons for the strike of Juror 50. Judge Arleo acknowledged that she had interrupted the prosecutor, and she wanted to make sure that the government had an opportunity to lay bare its full explanation, which it did. When you think about cases where the reviewing court says that the district court, the trial court, misapplied Step 3, blew it at Step 3, what are the sorts of reasons or evidence that, you know, that the reviewing court uses to make that decision that either does or doesn't exist here? I want to make sure I understand the question. In those cases where there's been a judicial finding on an appellate review that the trier fact did not properly apply the Batson criteria. Yes, in other words, that the clear error, that the defendants were able to satisfy even the clear error standard. So, obviously, the Supreme Court's precedence in this area, Flowers being the most recent, are very clear. When there's just overwhelming evidence that the explanations that were offered were pretextual because of a host of considerations. And Flowers itself said, by the way, in the concluding line of the opinion, it wasn't setting new ground, but just under the extraordinary circumstances of that case, which I think at that point, that was the sixth trial of that defendant. And in all of those trials. 41 out of 42. 41 out of 42 preemptory challenges were used to remove jurors who happened to be black. The comparative analysis showing that reasons that were being offered by the prosecutor applied equally, if not more so, to other members of the veneer who were allowed to stay on, were not struck, who happened to be white. That's very clear, compelling evidence that would leave a reviewing court with a definite and firm conviction that a mistake has been made. That's the clear error standard of review. Whether, as a legal matter, the court just simply didn't apply the framework properly, either misdescribed it or simply misapprehended it. I suppose I can give you, what I can say is, one, I don't think there's any basis to say that Judge Barlio misapprehended the framework, didn't do a sufficient job explaining her reasons. And for that, I would cite cases like, I would cite Savage itself, which acknowledged that the judge doesn't have to comment on every circumstance in the record. Rather, the record must make clear that the judge understood the relevant legal framework and adhered to it and considered all the circumstances before reaching her ultimate conclusion. The thing that makes it tricky here is this isn't just any old public interest firm that's concerned with public interest organization that's concerned with mandatory minimums. It's the NAACP. And so race is just inherently part of the equation. I understand why Your Honor suggests that. I'll respond in a couple of ways. First, to be clear, as a prosecutor himself acknowledged, the NAACP is a laudable organization, does wonderful work on behalf of this country for equal rights under the law. We never disputed that. We appreciate that. As federal prosecutors, a citizen of this great republic. The NAACP has never restricted its membership to persons of color. It is not a monochromatic organization. I don't think membership in the NAACP alone is an inherently racial reason for striking a juror. But I want to be clear. My colleagues did not rest on membership or, for that matter, attending meetings. Because the juror did say during Guadiroubo she didn't know much about the policies the prosecutors were concerned about. She did. She was active enough a member to have attended meetings. The prosecutor repeatedly said the concern was that laudable organization's advocacy on criminal justice matters of great salience to the case. This jury selection was taking place in June of 2018. A very salient issue then and now is racially disproportionate impact of drug trafficking penalties on communities of color. Racially disproportionate impact of mandatory minimum sentencing regimes. Okay? Those were salient issues then. They are salient issues now. And as the prosecutor said repeatedly, the problem is this. Mandatory minimums are very much at issue in this case. Three of our cooperators will admit on the stand that they are facing mandatory life. When I asked your friend whether the government's obliged to believe the juror when she says, but I didn't know anything about the mandatory minimum stuff. I was just a member for other reasons. He said, yeah, that's true. But the government then has to come forward with some grounds to not believe the jury. He can't just say I don't believe her. I don't think that's an accurate statement of the law. I don't think FLOWER stands for that position either. And again, I understand my friend to be saying that that's at step two as opposed to step three. And my friend also pivoted to Jones v. Ryan, a 1993 decision by then Judge Higginbotham, Jr. It's hard to see how to square that representation of the law with Perkett v. Ellum. Remember, Perkett v. Ellum, the race-neutral reason that was offered, I will be the first to admit, was ludicrous on its face. The only two black male jurors in the veneer pool were struck because they had two of them, they had facial hair, and because one of them had unkempt curly hair. Those, to my mind, are absurd reasons. But what the Supreme Court said in those circumstances is stage two is not about the plausibility, the reasonableness, how sensible the race-neutral reason is. It's is it race-neutral, does race inhere in the explanation? We're at step three here. We're at step three. This is a step three case. And once we're at a step three case, unless the judge, and once again, I submit, looking at the record, and the record is not just the judge's reasoning on day three when the strike of juror 50, who had been struck on round two the round before. You're honing in on a question that I actually was going to interrupt and ask you. Your friends on the other side do focus on transcript. This is transcript page 1026. It's essay 1686. And the judge is ruling on this issue. And the judge says, you know, it identifies, it says the government has come forward with race-neutral reasons for the challenge. And I'm satisfied that those reasons, her being a member of an organization that advocates on a broader basis for mandatory minimums, together with their perception for having a stronger personality, were race-neutral reasons that convinced me the strike was appropriate. I believe what I hear you saying is, well, that's not all. There is more to the ruling than that. It's not just that. And I want you to identify for me what are the additional things that I can point to and say, okay, here it is, here are the prong three, here's the prong three analysis, here are her rulings that explain this shorter ruling. Of course, Judge Montgomery reads. And if I may, the very next paragraph reads, I think I said this in so many ways over the last few minutes, that, you know, it's not that she. The issue is, was the government's challenge a pretext for discrimination? Did they really just make this up, either subliminally, and she was referring back to Judge McKee's teaching in Coombs, or intentionally to really strike her solely because of race? And earlier, before she said that. Well, then she goes on to say, I focus on the makeup of the jury pool. And your friends on the other side say, well, that's not appropriate either. Except they don't quite say that. Now, they backed off on that. And they're probably, they acknowledge because they have to, because this, in Savage, is the latest in a long line of cases, acknowledging that actually, whether a jury is, represents a broad cross-section of the veneer pool, is a relevant consideration. It certainly is not dispositive, and it would be a mistake for a judge to put excessive weight on it. But I don't read what she said here in this next paragraph as putting excessive weight on it. What she was saying is, look, it does matter to me, and she even provided the example, if the government was time and again, and we said this in our brief as well, if the government time and again, every time they exercise a peremptory challenge, there was just one black person in the box at that time. The 12 jurors in the box at that time. And I don't want to, I don't want to, the way jury selection changes from judge to judge, right, and from district to district, practice to practice. But at least in New Jersey, it's 12 jurors are in the box, and that's where the, that's where the four cost challenges happen, and then the peremptory challenges. And so, at any given time, if there were only one or two black jurors, and the government struck every time a black juror, that would be even more troubling, okay, even more troubling. And it's also, we've also said and acknowledged, one racially discriminatory strike here is one too many, right? But the point here is the judge hearing, after recounting all of the strikes, and making clear in the record that she had found for two of the strikes, at least two of the strikes, juror 149, who was the former bus driver and the union leader who had this huge personality, as my good friends acknowledge he did, and juror, I believe it's 242, who had a nephew who was serving a very long federal prison sentence for drug trafficking. She flat out said, in this day five proceeding, I find that those are, those were valid reasons, and they were not pretext for discrimination. So, I have in mind something that I think, you know, this court's precedent aptly stands for, and I think United States v. Milan is another example of this, and we cited that in our brief. But the court doesn't have to, the court could always explain more, right? But the question is, is it clear from this entire record, and this entire record includes her thorough explication of the Batson standard, her reliance on McCombs, not just to explain the standard, but when would she turn back to discuss our strike of juror 11, a strike I concede she initially found to be a problematic under Batson. She went back to Combs, and then said, after considering everything, I'm finding the government's reasons are race neutral thereto, and they're not pretext for discrimination. So the question here, really in my mind, just like it was before this court in the Milan decision back in 2000, I want to say 2001, was whether Judge Arleo here, like Judge Pazano, may he rest in peace, there, did he say enough? Did she say enough? The only, I recognize there, the only point on the Jenks is we understand our obligation to be to preserve rough notes and to make them available for the court's inspection upon request. The other point I will make is there was a trial and a retrial, and I think that says about all I need to say about the Jenks Act claim in this case. And so unless the panel has further questions for me, I would like to rely on my brief and our supplemental submissions with respect to both claims and any other claims at issue in this case. I ask that the judgments of conviction be affirmed, and I thank the court for inviting me to be here today. Thank you. Mr. Epstein. Thank you. Judge Porter, I'd like to go to your question about when is it that appellate courts have found that trial judges haven't done a proper step three analysis. Before you launch into that, do you agree that we're fighting over step three here? No, I think the NAACP reason fails at step two for the reasons this court set forth in Jones v. Ryan and for the reasons the court in Somerville stated. That said, it also fails at step three because it's implausible. And the district court here didn't do a sufficient step three analysis as to either reason. Starting with the strong personality, the court never made its own evaluation as to whether this juror had exhibited a strong personality. In Snyder v. Louisiana, the Supreme Court said the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory attempt, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed by the prosecutor. Now, the Seventh Circuit in both McMath and Rutledge said when the district court fails to make that evaluation, fails to make that finding, that's a Snyder violation. The case has to go back to the district court to make that determination. The other choice, the Ninth Circuit in Reynoso, same Snyder violation, said we'll review it for ourselves. And they didn't see the demeanor, the inattentiveness that the prosecutor was stating. And so they found that that's a violation on direct review. The district court here also never addressed the prosecutor's explanations or reasons for why they were asserting she had a strong personality. Now, this court in Riley v. Taylor said, and I'm quoting now, ultimately when we review the record at step three, we must decide whether the trial court's acceptance of the prosecutor's explanation has been made after a full consideration of all the evidence. And with regard to two of the jurors, they said the state courts failed to address the weaknesses in the state's explanations. And that's what we have here with respect to both reasons. She didn't address the weaknesses in these explanations about strong personality. I don't know what that record would look like because the judge is sitting there watching all of this and deciding for herself whether the juror has this or that sort of personality. So when the prosecution says she had a strong personality, should the judge say, I watched her and I disagree? Or what's that record look like? Well, with respect to the other African-American juror that the government made this claim about, she did exactly that. She said, I see it, too. I agree with you. He does have a strong personality. She never said anything like that with respect to this juror because this juror didn't exhibit a strong personality. And if the judge could have said, you know what, I'm not quite seeing it. Could you please explain to me how coaching some type of sporting event equates to a strong personality? I'm not getting it. That's what the judge could have done here. And with respect to the NAACP reason, the judge never, in making her final determination, never addressed the weakness in the argument that the juror had no knowledge of the NAACP's reform efforts. Thank you. Thank you both for excellent presentations. If this is submitted, we'll take it under advisement. Thank you. Judge Roth, we'll call you in, what, 10 minutes? OK. All right. Thank you. Recording stopped. Now I got it.